# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, solely in its capacity as Trustee for CITIGROUP MORTGAGE LOAN TRUST 2007-AR7,<br><br>                         Plaintiff,<br><br>                    -against-<br><br>CITIGROUP GLOBAL MARKETS REALTY CORP., and CITIMORTGAGE, INC.<br><br>                         Defendant. | Civil Action No.: 13 Civ. 6989 (GBD)<br><br>ECF Case<br><br>**SECOND AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff U.S. Bank National Association, not individually, but solely in its capacity as Trustee (the "Trustee") of the Citigroup Mortgage Loan Trust 2007-AR7 (the "Trust"), through its attorneys, McKool Smith P.C., brings this Second Amended Complaint against Citigroup Global Markets Realty Corp. (the "Seller," the "Sponsor" or "Citigroup") and CitiMortgage, Inc. ("CitiMortgage") at the direction of certain holders of certificates issued by the Trust. Except as otherwise indicated as to its own actions and conduct, the Trustee alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.      This action arises out of Citigroup's and CitiMortgage's breaches of contract relating to a securitized pool of 2,016 mortgage loans (the "Mortgage Loans" or "Loans") selected and sold by Citigroup and held by the Trust for the benefit of the holders of Certificates issued by the Trust (the "Certificateholders"). The Mortgage Loans were (and remain) the sole source of income from which the Trust makes payments to Certificateholders.

2.      Citigroup made extensive contractual representations and warranties regarding the characteristics of these Mortgage Loans, including their credit quality and their compliance with

1

applicable laws.  Potential investors in the Certificates did not have access to the information necessary to verify the characteristics of the Mortgage Loans and therefore relied upon those representations and warranties.  Thus, Citigroup's representations and warranties were essential to the securitization of the Mortgage Loans and investors' decision to invest in the Certificates issued by the Trust.

3.    Highlighting the critical importance of these representations and warranties, Citigroup further promised to cure any breach of these representations and warranties that materially and adversely affected the value of any Mortgage Loan or the interest of Certificateholders in the Loans or, if it failed to cure any such breach within ninety days, to repurchase the defective Loan.  This obligation to cure or repurchase was not contingent on any action by any other party; Citigroup had an independent obligation both (i) to notify the Trustee and (ii) to cure or repurchase the affected Loan within ninety days of becoming aware of a breach of a representation and warranty.[1]   In essence, while the parties agreed that Certificateholders would assume the risk that there might be defaults on Mortgage Loans which conformed to Citigroup's representations and warranties, they also agreed that Citigroup would assume the risk of Loans that failed to meet those representations and warranties in the first instance.

4.    A forensic review of 613 Mortgage Loans in Groups III and IV (the "Loan Review") revealed that at least 491 of those Mortgage Loans—*80% percent of the loans reviewed*—breached one or more of Citigroup's representations and warranties in a manner that

---

[1] If the breach was discovered within the first two years after the Trust was created, Citigroup could also replace the defective loan with one that complied with the representations and warranties.

materially and adversely affected the value of those Loans and the interests of Certificateholders therein.

5.      Upon learning of these breaches, the Trustee promptly notified Citigroup. The Trustee's notice included a detailed description of the basis for each breach with respect to each defective Loan. The Trustee requested that Citigroup cure the breaches or, if unable to cure within the required ninety-day period, repurchase the defective Mortgage Loans as it had promised. Despite clear evidence of numerous breaches of representations and warranties with respect to the Mortgage Loans in the Trust, Citigroup has failed, and continues to fail, to fulfill its promise to cure the breaches or repurchase those Loans. More than ninety days have passed since Citigroup received each of the Trustee's three breach notices (the "Breach Notices"), but Citigroup has failed to cure a single breach or repurchase a single Mortgage Loan. Instead, Citigroup has responded with boilerplate demands for additional information not required under the agreements they signed. The Trustee responded to Citigroup's boilerplate letters by a letter dated September 30, 2013. In this letter, the Trustee stated that, subject to certain conditions, the Trustee would be willing to go beyond the requirements of the agreements and provide requested loan files subject to a nondisclosure agreement and indemnity by Citigroup. To date, Citigroup has not responded to the Trustee's offer to provide additional information.

6.      The information contained in the Trustee's Breach Notices could not have been a surprise to Citigroup, as it knew well before receiving them that the Mortgage Loans contained breaches of its representations and warranties. Citigroup's routine practice was to conduct due diligence on each mortgage pool it intended to securitize by having a third party due diligence firm review all or arepr esentative sample of the mortgage loans to determine whether they complied with, among other things, the loan originators' underwriting guidelines and applicable

local, state and federal laws (both as represented and warranted by Citigroup). Through that due diligence, Citigroup discovered that a substantial percentage of the Mortgage Loans breached its representations and warranties. Four sources confirm Citigroup's discovery of information on defective Loans prior to the Closing Date of the Trust, which defects would constitute breaches of representations and warranties at and after the Closing Date. Additional information came to light after the Closing Date, further bolstering Citigroup's independent discovery of breaches.

7.     First, 406 Partners, LLC ("406 Partners"), one of Citigroup's third-party due diligence firms, reported to Citigroup that no fewer than ███ Mortgage Loans, including at least ███ Group III and IV Mortgage Loans, contained defects that constitute breaches of Citigroup's representations and warranties. After receiving 406 Partners' reports, Citigroup securitized these Loans anyway, did not repurchase the Loans thereafter and never informed the Trustee that the breaches existed. 406 Partners' specific determinations with respect to these ███ Mortgage Loans resulted from its review of a representative sample of ███ loans Citigroup considered including in the Trust. 406 Partners identified material defects with respect to ███ loans, or ███ percent of the sample. Despite this ██████████ rate, Citigroup securitized ███ percent of the defective loans identified to it and never assessed any of other Mortgage Loans for similar defects, despite the fact that by reviewing a representative sample of this size, Citigroup, being an experienced securitizer of mortgage loans, knew or should have known that a similar proportion of material defects would exist in the unsampled Mortgage Loans. Citigroup failed to repurchase any of the Mortgage Loans with respect to which it had discovered breaches and failed to notify the Trustee about a single breaching Loan.

8.     Second, Clayton Holdings, Inc. ("Clayton"), another of Citigroup's regularly retained third-party due diligence firms, revealed to the Financial Crisis Inquiry Commission that

at least 42 percent of the mortgage loans it reviewed for Citigroup failed to comply with underwriting guidelines, a fact that substantiates breaches of one or more representations and warranties. Yet according to Clayton, *Citigroup knowingly securitized 31 percent of those defective loans anyway*. Clayton's data covered the period from January 2006 through July 2007. In other words, Citigroup engaged in this conduct with respect to all of its securitizations and during precisely the same time in which it purchased and securitized the Mortgage Loans.

9.      Third, the U.S. Department of Justice ("Justice Department") investigated Citigroup's mortgage securitization practices, including with respect to the Trust. The Justice Department released its findings to the public in a written statement of facts on July 14, 2014 ("Statement of Facts"). The Justice Department found that, prior to Citigroup's securitization of pools of mortgage loans, Citigroup's due diligence firms routinely informed Citigroup that many of the reviewed loans failed to comply with underwriting guidelines, violated applicable laws or otherwise suffered from material defects that would breach Citigroup's representations and warranties. The Justice Department also found that Citigroup routinely securitized these defective loans anyway.

10.      Fourth, Citigroup itself confirmed that it knew that it securitized loans in violation of its representations and warranties when it expressly acknowledged the findings in the Justice Department's Statement of Facts. Citigroup acknowledged these facts in a written, publicly disclosed settlement agreement with the Justice Department, in which Citigroup agreed to pay $7 billion to resolve the Justice Department's claims against it.

11.      Moreover, Citigroup continued to discover breaches after the Closing Date. For example, when the Justice Department informed Citigroup of its findings, Citigroup thereby discovered representation and warranty breaches and should have provided notice to the Trustee

and should have repurchased the defective Mortgage Loans. Indeed, the Justice Department specifically identified this Trust as one of the securitizations that it reviewed and "determined to contain significant percentages of defective loans."[2]

12.     Citigroup's failure to comply with its contractual obligations strikes at the heart of the parties' bargain. The Certificates were priced, marketed, and sold based upon (i) the expected aggregate cash flows generated from principal and interest payments on the Mortgage, Loans; (ii) the veracity of the representations and warranties relating to the Mortgage Loans, and (iii) Citigroup's covenant to cure or repurchase defective Mortgage Loans should any of those representations and warranties be incorrect. Given those representations, warranties and covenants, the Certificateholders assumed the risk that, even when the Mortgage Loans were underwritten properly, some borrowers might default on their Mortgage Loans and that, as a result, the Trust's cash flows could drop below the level necessary to pay scheduled distributions on the Certificates. But Certificateholders did not assume the risk associated with Loans that breach representations and warranties—breaches that distort an accurate understanding of the credit quality and other characteristics of the Mortgage Loans and make the Mortgage Loans far riskier than represented.

13.     Citigroup was the "Seller" and "Sponsor" of the transaction. In its role as Seller/Sponsor, Citigroup selected the mortgage companies from which to obtain Mortgage Loans, selected the Loans to include in the Trust, and chose the servicers of the Loans and the parties to administer the Trust. It had far more information about the Mortgage Loans than any

---

[2] Settlement Agreement between Citigroup, Inc., and the Department of Justice, at 5 n.1 (July 14, 2014), *available at* http://www.justice.gov/iso/opa/resources/558201471413645397758.pdf ("Statement of Facts"). (*citing* Appendix 1), Citigroup, Inc., RMBS Proposed Settlement, List of RMBS Trusts 7, *available at* http://www.justice.gov/iso/opa/resources/932014714137131173954.pdf).

other transaction party.  Citigroup had regular contact, and a direct contractual relationship, with the companies that originated the Mortgage Loans.  Moreover, as part of its purchase, Citigroup had access to the documentation supporting each Mortgage Loan (the "Loan File"), which typically included the borrower's loan application, credit report, income, asset and employment verifications, disclosures and an appraisal of the subject property.  Citigroup therefore selected the Mortgage Loans to place in the Trust with full access to detailed information on each one, and thus had full ability to ensure that its representations and warranties were accurate.

14.     By contrast, the Certificateholders' only source of information about the Mortgage Loans was Citigroup.  Certificateholders had no means to verify the accuracy of information they received from Citigroup, and thus relied upon Citigroup's representations and warranties and its promise to cure or repurchase Mortgage Loans with breaches that have a material adverse effect on the value of the Mortgage Loans or the interests of Certificateholders. Indeed, the closing of the transaction *was expressly conditioned* on Citigroup's representations and warranties being true and correct.  Through its cure or repurchase obligations, Citigroup assumed the entire risk that these representations and warranties were inaccurate.

15.     Without Citigroup's representations and warranties—and its accompanying promise to cure or repurchase when such representations and warranties are breached—investors would not have been as able to evaluate the risk they were taking on, and thus would have been less willing to invest in Certificates backed by the Mortgage Loans.  Without willing investors, Citigroup and its affiliates would not have received the substantial fees and other compensation flowing to them from this transaction.

16.     Citigroup's decision to include in the Trust no fewer than 491 Mortgage Loans that materially breached its representations and warranties, coupled with its subsequent decision

to refuse to cure or repurchase those Loans, fundamentally altered the transaction contemplated by the parties in the agreements governing the Trust. The sheer number of defective Loans sold to the Trust far exceeds the reasonable expectations of the parties. While the cure/repurchase mechanism provided a safety valve for a handful of mistakes, it was not a license for Citigroup to securitize thousands of defective Mortgage Loans. The nature and extent of these breaches further destroyed the economic rationale for the transaction, which was intended to create Certificates backed by a pool of mortgage loans with clear and disclosed risks. As a result of Citigroup's actions, the mortgage pool backing the Certificates was a significantly riskier investment than the Trust and Certificateholders bargained for.

17.     Citigroup's failure to provide notice of breaches it previously discovered, and its refusal to cure or repurchase the identified Mortgage Loans (identified either through notice from the Trustee or Citigroup's own knowledge) entitles the Trust to an award of specific performance to compel Citigroup to repurchase the Mortgage Loans for which it received notice or which are identified to it in the future, as well as for any other Mortgage Loans that Citigroup knows or has reason to know contain similar breaches, and/or equivalent damages.

18.     CitiMortgage, an affiliate of Citigroup, is the Master Servicer for the Trust, and is also a sub-servicer of certain of the Mortgage Loans. As Master Servicer, CitiMortgage had duties both to notify the Trustee of any breaches it discovered and to enforce Citigroup's obligations, including Citigroup's duty to cure and/or repurchase defective Mortgage Loans. CitiMortgage, through its role as sub-servicer and also as Master Servicer discovered breaches of representations and warranties in the Mortgage Loans that it serviced. This is particularly true with regard to those Mortgage Loans serviced by CitiMortgage that were (i) the subject of a loan modification; (ii) for which the related borrower filed for bankruptcy; (iii) for which

8

CitiMortgage foreclosed on the mortgaged property securing the Mortgage Loan; or (iv) for which the mortgage insurer sent a rescission notice.

19.     CitiMortgage's failure as Master Servicer to provide notice of the breaches it discovered while servicing the Mortgage Loans and its failure to enforce Citigroup's obligation to cure or repurchase the affected Mortgage Loans thereafter entitles the Trust to an award of damages for any Mortgage Loans that CitiMortgage knew or had reason to know breached representations and warranties, but which, as a result of these failures, were not repurchased.

### PARTIES

20.     Plaintiff U.S. Bank National Association, as Trustee of the Trust, is a national banking association organized and existing under the laws of the United States with its registered main office in Ohio.  U.S. Bank serves as Trustee of the Trust pursuant to a Pooling and Servicing Agreement dated as of May 1, 2007, among Citigroup Mortgage Loan Trust, Inc., as Depositor, CitiMortgage, Inc., as Master Servicer and Trust Administrator, and U.S. Bank National Association, as Trustee ("PSA").[3]

21.     Defendant, Citigroup Global Markets Realty Corp. is a Delaware corporation with a principal place of business in New York.  Citigroup Global Markets Realty Corp. was the Seller of the Mortgage Loans under a Mortgage Loan Purchase Agreement, dated May 30, 2007 ("MLPA")[4] and was the Seller and Sponsor under the PSA.

22.     Defendant, CitiMortgage is a New York corporation with a principal place of business in O'Fallon, Missouri.  CitiMortgage, among other things, is the Master Servicer under

---

[3] A true and correct copy of the PSA is attached hereto as Exhibit 1.

[4] A true and correct copy of the MLPA is attached hereto as Exhibit 2.

the PSA, as well as a sub-servicer with responsibility for servicing certain Mortgage Loans in the Trust.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction and venue over this proceeding pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of costs, exceeds $75,000.  For diversity purposes, a national banking association's citizenship is determined solely by the location of its main office.

24.     Venue is proper in this district pursuant to 28 U.S.C. §1391(1) because Citigroup has its principal place of business within this judicial district.  Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(2) because a substantial part of the events and omissions that give rise to the claims herein occurred in New York.  The Trust was formed under New York law; and Citigroup and CitiMortgage made the relevant representations and warranties and undertook the relevant obligations in New York in agreements that are expressly governed by New York law.

## FACTUAL BACKGROUND

### I.     THE CMLTI 2007-AR7 SECURITIZATION.

25.     This case concerns mortgage-backed pass-through certificates, more commonly known as residential mortgage-backed securities.  Asset-backed securitizations distribute risk by pooling cash-producing assets such as mortgage loans, and issuing securities backed by that pool of assets.  The most common form of securitization of mortgage loans involves the creation of a trust to which a seller entity sells a portfolio of mortgage loans.  The transfer of assets to a trust is typically a two-step process: "the financial assets are transferred by the seller first to an intermediate entity, often a limited purpose entity created by the seller . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-

backed transaction." Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

26.     After receiving a pool of mortgage loans, the trust issues securities, known as certificates, using the pool of loans as collateral. Investors in the certificates acquire certain rights related to the mortgage loans, including rights to the income flowing from the mortgages (primarily borrowers' payments of principal and interest).

27.     Citigroup was the Sponsor of the CMLTI 2007-AR7 securitization, which closed on May 31, 2007. As the Sponsor, Citigroup selected a mortgage pool of 2,016 loans with an aggregate principal balance of approximately $850.6 million. Citigroup purchased the Mortgage Loans from numerous loan originators: American Home Mortgage Corp., Countrywide Home Loans, Inc., HomeBanc Mortgage Corporation, MortgageIT, Inc., National City Mortgage Co., Opteum Financial Services, LLC, PMC Mortgage Corporation, Provident Mortgage Corporation, Quicken Loans, Inc., Silver State Mortgage, SunTrust Mortgage, Inc., Taylor, Bean & Whitaker Mortgage Corp., Weichert Financial Services, and Wells Fargo Bank, N.A., as well as its affiliate CitiMortgage (each of the above an "Originator", and together, the "Originators"). Citigroup then sold these Mortgage Loans to its affiliate Citigroup Mortgage Loan Trust, Inc. (the "Depositor") on the Closing Date pursuant to the MLPA. Pursuant to the PSA, the Depositor simultaneously conveyed the Mortgage Loans to the Trust on the Closing Date, and the Trust issued approximately $831.9 million in Certificates and delivered those Certificates to the Depositor. Another Citigroup affiliate, Citigroup Global Markets, Inc., underwrote the Certificates and sold them to investors. Upon information and belief, each of these Citigroup affiliates received compensation from their roles in the formation of the Trust and the resulting sale of Certificates.

28.     Concurrently with its transfer of the Mortgage Loans, the Depositor also transferred, assigned, set over and otherwise conveyed to the Trustee "the rights of the Depositor under the Mortgage Loan Purchase Agreement." PSA § 2.01.

29.     The Mortgage Loans were divided into five groups, labeled "Group I" through "Group V" (individually, a "Loan Group").[5]  Loan Group III consisted of approximately 465 Mortgage Loans with an aggregate principal balance of approximately $306 million as of the cut-off date of the securitization.  Group III Loans were represented as not conforming with the loan limits set by Fannie Mae and Freddie Mac.  Group IV consisted of approximately 305 Mortgage Loans with an aggregate principal balance of approximately $73 million as of the cut-off date of the securitization.  The Group IV loans were represented to conform to the loan limits set by Fannie Mae and Freddie Mac.  The cash flows from the Loans in each Loan Group were directed primarily toward specific classes of Certificates.

30.     The Trust is administered by several entities, and, other than the Trustee, all of these entities are Citigroup affiliates.  In particular, CitiMortgage is not only an Originator, it also acts as Trust Administrator, Master Servicer, and a Sub-Servicer.  As Trust Administrator, CitiMortgage is, among other things, responsible for making certain calculations and determinations with regard to distributions to Certificateholders.  As Master Servicer it is responsible for, among other things: (1) aggregating monthly servicer reports and remittances, (2) servicing the Mortgage Loans (notwithstanding any subservicing arrangement), including overseeing of the performance of the sub-servicers, (3) enforcing the repurchase obligations of

---

[5] The Trustee and Citigroup have entered into a settlement agreement with respect to the Mortgage Loans that are held in Group I and Group V.  The Trustee has filed a petition seeking court approval of the settlement.  Claims with respect to the Mortgage Loans in Groups I and V remain subject to a tolling and forbearance agreement and, as such, are not a part of this lawsuit.

the Sponsor, and (4) notifying the Trustee and other parties to the PSA of breaches of its representations and warranties. Pursuant to Section 3.04 of the PSA, the Master Servicer is "obligated and primarily liable to the Trustee and the Certificateholders for the servicing and administering of the Mortgage Loans in accordance with the provisions of Section 3.01 without diminution of such obligation or liability by virtue of such Sub-Servicing Agreements."

31. The Originators, including CitiMortgage, generally acted as sub-servicer for the Loans each originated. The sub-servicers are responsible for collecting monthly mortgage payments from borrowers and seeking to recover from borrowers who default on their Mortgage Loans, consistent with the PSA and generally accepted servicing standards. As sub-servicer, CitiMortgage is responsible for the servicing and administration of certain Mortgage Loans, and as Master Servicer, for all Mortgage Loans. Citibank, N.A. is the Paying Agent, Certificate Registrar and Authenticating Agent. The Trust Administrator, Master Servicer and the sub-servicers act independently of the Trustee pursuant to the terms of the PSA.

32. The Trustee holds the Mortgage Loans for the benefit of the Certificateholders, and as assignee of the Depositor the Trustee has the right to enforce Citigroup's representations and warranties under the MLPA. The Trustee also has the right to enforce Citigroup's obligation to cure or repurchase Mortgage Loans that fail to comply with such representations and warranties in a manner that materially adversely affects the value of the Mortgage Loan or the interests of the Certificateholders therein.

## II.     CITIGROUP'S REPRESENTATIONS AND WARRANTIES.

33. Citigroup's representations and warranties regarding the Mortgage Loans are specified in Section 5 and the Exhibits of the MLPA and include, without limitation, the following:

13

- No fraud was committed in connection with the Mortgage Loan.  MLPA Ex. A(xxx), Ex. B(xxv), Ex. C(qq), Ex. D(xxx), Ex. E(xxxvi), Ex. F(xi), Ex. G(xxx), Ex. H(xxxvi), Ex. I(xxxv), Ex. J(xxx), Ex. K(viii).

- As of the Closing Date, there is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration.  MLPA Ex. A(xviii), Ex. B(xx), Ex. C(n), Ex. D(xviii), Ex. E(xvii), Ex. F(xvii), Ex. G(xviii), Ex. H(xvii), Ex. I(xvii), Ex. J(xviii), Ex. K(xviii).

- Each mortgage loan was underwritten in conformance with the Underwriting Guidelines (or "Underwriting Standards") of the Seller at the time of origination.  MLPA, Ex. A(vii), Ex. C(oo), Ex. D(vii), Ex. E(xxvi), Ex. F(xxii), Ex. G(vii), Ex. H(xxvi), Ex. I(xxv), Ex. J(vii), Ex. K(xxxvi).

- Compliance with "any and all requirements of any federal, state or local law" including, without limitation, usury, truth in lending, real estate settlement procedures, predatory and abusive lending, consumer credit protection, equal credit opportunity, fair housing or disclosure laws applicable to the origination and servicing of mortgage loans of a type similar to the Mortgage Loans.  MLPA, Ex. A(ix), Ex. B(xvi), Ex. C(g), Ex. D(ix), Ex. E(viii), Ex. F(vii), Ex. G(ix), Ex. H(viii), Ex. I(viii), Ex. J(ix), Ex. K(ix).

- The Mortgage is a valid, existing and enforceable first or second lien, as applicable, on the related Mortgaged Property. MLPA Ex. A(ix), Ex. B(iii), Ex. C(j), Ex. D(xi), Ex. E(x), Ex. F(x), Ex. G(xi), Ex. H(x), Ex. I(x), Ex. J(xi), Ex. K(xi).

- As of the Closing Date, the Mortgage has not been satisfied, canceled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such satisfaction, cancellation, subordination, rescission or release. MLPA Ex. A(x), Ex. B (xii), Ex. C(h), Ex. D(x), Ex. E(ix), Ex. F(viii), Ex. G(x), Ex. H(ix), Ex. I(ix), Ex. J(x), Ex. K(vi).

- The origination practices with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination industry.  MLPA Ex. A(xxii), Ex. C(p), Ex. D(xxii), Ex. E(xxiii), Ex. G(xxii), Ex. H(xxiii), Ex. I(xxii), Ex. J(xxii).

- The loan-to-value ratio of any mortgage loan ("LTV") was not more than 95% and the combined-loan-to-value ratio (the ratio of all debts against the property including the mortgage loan, "CLTV") was not more than 100%.  MLPA Ex. A(xxviii), Ex. B(xxii), Ex. D(xxviii), Ex. E(xxxiv), Ex. F(xv), Ex. G(xxvii), Ex. H(xxxiv), Ex. J(xxviii).

14

- The information set forth in the Mortgage Loan Schedule[6] is  complete, true and correct.  MLPA Ex. A (i), Ex. B (i), Ex. C (a), Ex. D(i), Ex. E(i), Ex. F(i), Ex. G(i), Ex. H(i), Ex. I(i), Ex. J(i), Ex. K(i).

34.     Citigroup's representations and warranties were, and remain, material to the Trust and the Certificateholders.  Indeed, Section 7 of the MLPA expressly makes the accuracy of Citigroup's representations and warranties a condition to the closing of the transaction: "The closing shall be subject to each of the following conditions:  (a) [a]ll of the representations and warranties of [Citigroup] under this Agreement shall be true and correct in all material respects as of the date which they are made and no event shall have occurred which, with notice or the passage of time, would constitute a default under this [MLPA]."  MLPA § 7.

35.     Through the representations and warranties, Citigroup promised that the Mortgage Loans met certain requirements, such as (i) credit quality thresholds regarding the borrowers' ability to repay their loans on time and in full, (ii) origination in compliance with legal requirements, and (iii) that the documentation required to issue (and enforce) the Mortgage Loans was complete.  Without these assurances, backed by Citigroup's obligation to repurchase loans that breached its representations and warranties, it is unlikely that Citigroup could have sold the Mortgage Loans to the Trust (or sold the Certificates to investors), or at the very least, could not have sold them for as high a price.

36.     The MLPA provides that within ninety days of "the earlier of either discovery by or notice to [Citigroup] of any breach of a representation and warranty made by [Citigroup] that

---

[6] The Mortgage Loan Schedule ("MLS") is a document Citigroup prepared and includes information that is important to Certificateholders, such as the balance remaining on a property's senior lien, the original appraisal value of the property, whether the loan is a balloon loan, the loan's current interest rate, the borrower's debt-to-income ratio, the borrower's monthly income and FICO score, whether the property is a primary residence, second home or investment property, the original balance of the loan, the original LTV ratio, property type descriptions, and purchase price. The MLS is typically the Certificateholders' primary, if not sole, means of obtaining this type of information on a loan-by-loan basis.

materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans or the interest therein of [the Depositor], [Citigroup] shall use its best efforts promptly to cure such breach in all material respects." MLPA § 6. If the breach cannot be cured, then Citigroup "*shall*, at [the Depositor's] option, repurchase such Mortgage Loan at the Purchase Price." *Id.* (emphasis added). Section 6 also gives the Depositor the option to request that Citigroup substitute a compliant mortgage loan for the breaching Mortgage Loan. Both repurchase and substitution must be made in a manner "consistent with Section 2.03 of the [PSA]." *Id.* Pursuant to Section 2.03 of the PSA, substitution of a breaching Mortgage Loan may only occur within two years of the Closing Date. This option is thus no longer available to the Trust, since the Closing Date was May 31, 2007.

     37.    Consistent with the clear allocation of risk between the Trust and Citigroup, the MLPA requires Citigroup to repurchase defective Mortgage Loans regardless of whether Citigroup was aware of the breach at the time the representations and warranties were made— even with respect to representations and warranties made to the best of Citigroup's knowledge. In that regard, the MLPA provides:

> With respect to the representations and warranties contained herein that are made to the knowledge or the best knowledge of [Citigroup], or as to which [Citigroup] has no knowledge, if it is discovered that the substance of any such representation and warranty is inaccurate and the inaccuracy materially and adversely affects the value of the related Mortgage Loan, or the interest therein of the [Depositor] or the [Depositor's] assignee, designee or transferee, then notwithstanding [Citigroup's] lack of knowledge with respect to the substance of such representation and warranty being inaccurate at the time the representation and warranty was made, such inaccuracy shall be deemed a breach of the applicable representation and warranty and [Citigroup] shall take such action [as the MLPA requires].

MLPA § 6. MLPA Section 6 further specifically provides that upon Citigroup's discovery of any material beach, it is to give "prompt written notice" of the breach to the Depositor. *Id.*

Section 6 also places a duty on Citigroup to cure or repurchase a defective Mortgage Loan "within 90 days of the earlier of either discovery by or notice to the Seller" of any material breach. *Id.*

38.     The PSA assigns all of the Depositor's rights under the MLPA to the Trustee and conveys all right, title, and interest in the Mortgage Loans to the Trustee for the benefit of the Certificateholders.  PSA § 2.01.  The PSA provides that upon any party's discovery of a breach, that party must notify the other parties.  Upon receipt of such notice, the PSA provides that the Trustee is then to request that Citigroup cure the breaches or repurchase the Mortgage Loans within ninety days of notification:

> Upon discovery or receipt of notice by the Depositor, the Master Servicer, the Trust Administrator or the Trustee of . . . the breach by [Citigroup] of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the party so discovering or receiving notice shall promptly notify the other parties to this Agreement, and the Trustee thereupon shall promptly notify [Citigroup] of such defect, missing document or breach and request that the Seller deliver such missing document or cure such defect or breach within 90 days from the date [Citigroup] was notified of such missing document, defect or breach . . .

PSA §2.03(a).   If, after such notification, Citigroup fails to cure or repurchase within the provided ninety-day period:

> the Trustee shall enforce the obligations of [Citigroup] under the Mortgage Loan Purchase Agreement (i) to repurchase such Mortgage Loan  . . . at the Purchase Price within 90 days after the date on which [Citigroup] was notified (subject to Section 2.03(e)) of such missing document, defect or breach, and (ii) to indemnify the Trust Fund in respect of such missing document, defect or breach . . .

*Id.*

17

39.     The PSA defines "Purchase Price" as, essentially, the unpaid principal balance of the Loan, less any proceeds from foreclosure if the loan was liquidated, plus accrued interest and costs and expenses.  The Purchase Price is thus designed to make the Trust whole for any Loan that was included in the Trust in breach of a representation and warranty.[7]

40.     Citigroup additionally agreed to pay the Trust's costs and expenses, including attorney's fees, resulting from a breach of a representation and warranty vis-à-vis the Purchase Price.  Specifically, the definition of "Purchase Price" includes "in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03, expenses incurred or to be incurred by the Trust Fund in respect of the breach or defect giving rise to the purchase obligation."  PSA § 1.01.

41.     Citigroup's cure or repurchase obligation was central to the securitization of the Mortgage Loans because it (i) incentivized Citigroup to ensure that prudent lending practices were employed in the origination of the Mortgage Loans and (ii) allocated the risk of poor lending practices to the party best able to detect and prevent them—Citigroup.  Traditionally,

---

[7] The definition of "Purchase Price" in section 1.01 of the PSA provides as follows: "With respect to any Mortgage Loan or REO Property to be purchased pursuant to or as contemplated by Section 2.03, Section 3.16(c) or Section 9.01, and as confirmed by an Officers' Certificate from the Master Servicer to the Trustee and the Trust Administrator, an amount equal to the sum of: (i) 100% of the Stated Principal Balance thereof as of the date of purchase (or such other price as provided in Section 9.01), (ii) in the case of (x) a Mortgage Loan, accrued interest on such Stated Principal Balance at the applicable Mortgage Loan Remittance Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or an advance by the Master Servicer, which payment or advance had as of the date of purchase been distributed pursuant to Section 4.01, through the end of the calendar month in which the purchase is to be effected, and (y) an REO Property, the sum of (1) accrued interest on such Stated Principal Balance at the applicable Mortgage Loan Remittance Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or an advance by the Master Servicer through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, plus (2) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such purchase is to be effected, minus the total of all net rental income, Insurance Proceeds, Liquidation Proceeds and P&I Advances that as of the date of purchase had been distributed as or to cover REO Imputed Interest pursuant to Section 4.01, (iii) any unreimbursed Servicing Advances and P&I Advances and any unpaid Servicing Fees allocable to such Mortgage Loan or REO Property; (iv) any amounts previously withdrawn from the Collection Account in respect of such Mortgage Loan or REO Property pursuant to Sections 3.11(a)(ix) and Section 3.16(b), and (v) in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03, expenses incurred or to be incurred by the Trust Fund in respect of the breach or defect giving rise to the purchase obligation including any costs and damages incurred by the Trust Fund in connection with any violation of any predatory or abusive lending law with respect to the related Mortgage Loan." *See* PSA at 32-33.

18

loan originators financed their mortgage business through customer deposits, retained ownership of the loans they originated, and directly received mortgage payments from borrowers. They earned a profit based on the spread between the interest they received on the loans and the interest they paid on their depository accounts. When an originator held a mortgage through the term of the loan, it alone bore the risk of loss if the borrower defaulted and the value of the collateral was insufficient to repay the loan. As a result, originators had strong economic incentives to apply prudent underwriting standards to verify borrower creditworthiness.

42.     Mortgage securitization can remove these incentives toward prudent lending. In the securitization context, originators earn a profit from the immediate sale of the loan rather than from the profit generated on the interest spread over the life of the loan. Once the loans are sold, the credit risk on those loans shifts to investors. For this reason, the more loans an originator issues, the more product it has to sell and the more profit it can generate, while at the same time avoiding the credit risk inherent in holding the loan. Thus, rather than being a key component of profitability, underwriting guidelines and other credit criteria act as a constraint on profitability because they restrict a lender from issuing more loans to less creditworthy borrowers. By undercutting or ignoring those credit criteria, the lender can originate more loans. As long as the lender sells the loan, it does not take on additional risk by originating riskier loans — it just makes more money.

43.     If a sponsor originates or purchases loans to hold on its books as investments, the risk of default will loom large in its decision to issue or purchase the loans. But because sellers in securitizations originate and/or acquire loans solely to sell and securitize them, their primary focus shifts to increasing volume, even at the expense of credit quality. As such, they have little stake in the performance or quality of the loans because they pass the risk of default on to the

19

securitization trust, and ultimately, to its investors. Thus they have little incentive to carefully scrutinize the loans they acquire.

44.      The cure/repurchase mechanism provides an essential deterrent to such misconduct. It is intended to ensure that sellers such as Citigroup adhere to prudent lending practices. If a seller is faced with the risk that it will be forced to repurchase a materially deficient loan, the seller will have the necessary incentive to ensure that its representations and warranties are accurate. And because the seller is in the best position to verify the quality of the loans it intends to securitize, allocating the risk of deficiencies in the loans to the seller is appropriate and reasonable.

### III.      THE MORTGAGE LOANS FAILED TO COMPLY WITH CITIGROUP'S REPRESENTATIONS AND WARRANTIES.

45.      Certain Certificateholders instructed the Trustee to obtain the Loan Files for Group III and Group IV Mortgage Loans from the servicers. The Loan Review consisted of a full forensic review of the credit, collateral, and compliance components for 613 Mortgage Loans.[8] TheL oan Review, which compared the Group III and IV Mortgage Loans against Citigroup's representations and warranties (including, without limitation, by examining the underwriting parameters and standards in place at the time of origination to determine if the Group III and IV Mortgage Loans conformed to the representations and warranties contained in the MLPA), is also known as a "re-underwriting" because it repeats the loan underwriting exercise the loan originator was supposed to conduct prior to issuing the loan.

---

[8]  The Loan Review consisted of 432 Mortgage Loans from Group III, with a total principal balance at securitization of approximately $287 million, and 181 Mortgage Loans from Group IV, with a total principal balance at securitization of approximately $44 million.

46.     The Loan Review did not reveal merely that *some* Group III and IV Mortgage Loans breached Citigroup's representations and warranties; rather, it revealed that the vast majority of loans in Groups III and IV were in breach.  Of the 613 Group III and Group IV Mortgage Loans reviewed, 491 Mortgage Loans (80 percent of the Mortgage Loans reviewed and almost 64 percent of the total number of Mortgage Loans in Groups III and IV combined) contained at least one breach that had a material and adverse impact on the value of the Mortgage Loan or the Certificateholders' interests therein.[9]  These breaches included such fundamental issues as misrepresentations of the borrower's income, employment and/or debt obligations; violations of underwriting guidelines; incorrect calculations of debt and debt-to-income ratios; excessive loan-to-value ratios; violations of high cost loan statutes and other applicable laws; and significant inaccuracies in the Mortgage Loan Schedule.  The specific representations and warranties breached with respect to the 491 Group III and Group IV Mortgage Loans are listed in Exhibit 3 hereto.

47.     Prior to receipt of the Breach Notices, Citigroup was on notice of the pervasive nature of the breaches of representations and warranties in this Trust by virtue of its diligence of the Mortgage Loans, as is described in detail below.  Citigroup's prior notice of breaches of representations and warranties is further evidenced by the widespread nature of such breaches identified to Citigroup across its securitizations, as disclosed by Citigroup in its ABS-15G reports and as is further described below.  Thus, Citigroup has received sufficient notice of all breaching Group III and IV Mortgage Loans in the Trust.

---

[9]  The 491 Mortgage Loans found to have breaches consisted of 361 loans from Group III, with a total principal balance at securitization of approximately $237 million, and 130 breaching loans from Group IV, with a total principal balance at securitization of approximately $32 million.

48.    These breaches materially and adversely affected the value of the Mortgage Loans and the interests of Certificateholders by, among other things, concealing the heightened risks inherent in the loans. A borrower's income and aggregate debt obligations are primary factors used to assess whether the borrower is able to repay a loan. Indeed, the ratio of monthly debt payments to monthly income (also known as the debt-to-income or "DTI" ratio) is a primary criterion in the underwriting process. Loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios are both key criteria for assessing the likelihood that a borrower will repay a loan, and are useful for determining the ability of the owner of the loan to recover against the subject property in the event foreclosure is necessary. The LTV ratio reflects the percentage of the property's value covered by the Mortgage Loan. For example, a 75% LTV ratio means that the mortgage equals 75% of the property's value, and the borrower owns the remaining 25% in value as equity. That 25% equity provides the borrower with an important incentive not to default (and potentially lose his/her equity in the property) and also acts as security in the event a borrower is unable to pay. The higher the LTV ratio, the higher the risk that the Trust will be unable to recover the full value of the loan through foreclosure. The CLTV ratio reflects the percentage of the property value covered by all loans secured by that property.

49.    Inaccurate LTV, CLTV, and DTI ratios further create material inaccuracies in the Mortgage Loan Schedule. The MLS is often a critical source of information regarding key characteristics of the Mortgage Loans, and is used by both credit rating agencies and potential investors to assess the risks in the mortgage pool (and thus in the Certificates). Because neither potential investors nor rating agencies have access to the underlying Loan Files prior to purchasing Certificates, they have no way to verify that the information on the MLS is correct.

They must instead rely upon the Sponsor's representation and warranty that the MLS is correct in all material respects.

50.     Occupancy status also directly impacts the risk profile of the loan because a borrower is much less likely to default on a mortgage secured by her primary residence than she is on a loan secured by a second home or investment property.  Likewise, accurate information concerning a borrower's cash and other assets is important in assessing risk because these assets provide an alternative source of loan repayment in the event a borrower loses her job.

51.     Finally, Mortgage Loans with missing documentation or that fail to comply with applicable law can, among other things, be more difficult to enforce against the borrower and/or subject property, and may be more difficult and expensive to service.  The lack of documentation also makes it much more difficult to determine if the Mortgage Loan has the characteristics represented by Citigroup.

52.     The defective Mortgage Loans in the Trust at issue here often contain breaches of more than one representation and warranty, further increasing the risk to Certificateholders and decreasing the value of the Loans.  The following examples are illustrative:

- Loan xxxx9418: This loan was originated in 2007 with an original principal balance of $999,999.  The borrower stated on his loan application that he was employed as an "area sales manager" for the past five years, earning $32,600 per month.  However, the loan origination file contained the borrower's 2006 tax return, in which the borrower claimed to have *zero income* for the year 2006.  The underwriting guidelines further required the borrower to disclose all debt obligations, including all pending transactions that would result in a change in the borrower's monthly debt obligations.  A records search further indicated that the borrower had an existing first and second mortgage on another property in the amounts of $148,043 and $63,447, respectively.  The borrower did not disclose this information on his application and the underwriter failed to conduct a diligent search to discover the debt.  Thus, although the Originator's guidelines required the borrower's DTI not to exceed 45%, because the borrower had no income, the DTI was in fact incalculable.  All of this information was further listed inaccurately on the Mortgage Loan Schedule.

23

- Loan xxxx4163: This loan was originated in 2007 with an original principal balance of $522,000. The borrower stated earnings of $180,000 annually on the loan application. However, the loan origination file contained the borrower's 2006 tax returns, which showed that the borrower's annual income was actually $65,663. The borrower also had recently acquired an undisclosed second mortgage in the amount of $25,000. A recalculation of DTI based on the borrower's verified annual income and other debt yields a DTI of 91.26%, which exceeds the underwriting guideline maximum of 38%. As a result of these inaccuracies, including the failure to list the $2,991 in monthly principal and interest from the undisclosed second mortgage, the information contained on the Mortgage Loan Schedule for this loan was incorrect.

- Loan xxxx9360: This loan was originated in 2007 with an original principal balance of $644,000. On his loan application, the borrower stated he was employed as a Latin America Sales Director earning $23,000 per month and that he had been in that position for three years. However, the loan origination file contained the borrower's 2006 tax return, which listed the borrower as an "independent artist and singer," with an actual 2006 income of $5,850 for the year ($487 per month). The borrower further listed two bank accounts on the loan application with a total balance of $118,000. The actual combined balance of those two bank accounts at origination was $893. Finally, the origination credit report showed that the borrower had utilized 88% of all credit available to him before applying for the mortgage. A recalculation of DTI based on the borrower's verified income of $487 yields a DTI of 1,703% which exceeds the guideline maximum of 31.74%. This information was also incorrectly listed in the Mortgage Loan Schedule.

- Loan xxxx3879: This loan was originated in 2007 with an original principal balance of $109,800 as a cash-out refinance of a primary single family residence. The loan was listed as having a 90% LTV/CLTV, and the borrower listed no other significant outstanding debt obligations on his loan application. However, both the MERS report and borrower's credit report revealed that the borrower had 15 undisclosed mortgages at the time of the subject closing. The total amount of these undisclosed mortgages was over $1.2 million.

## IV.  CITIGROUP ITSELF KNEW OF MATERIAL BREACHES IN THE MORTGAGE LOANS.

### A.  Citigroup Knew Loans Would Breach Prior to Making the Representations and Warranties.

53.    Citigroup discovered the vast extent of the widespread breaches in the Mortgage Loans at the time Citigroup made its representations and warranties in the MLPA.

54.     Prior to making its representations and warranties, Citigroup performed its own comprehensive re-underwriting of, at a minimum, a sample of the Mortgage Loans.  Citigroup's corporate policy, according to a former Senior Vice President and Chief Underwriter, was to re-underwrite either all of the loans in a mortgage pool if possible, or to re-underwrite a statistically significant sample of the mortgage pool.[10]  As any such sample was statistically significant, it was constructed to be representative of the entire pool so that the results of the due diligence could be extrapolated to the entire pool of loans.  Citigroup typically relied on third-party firms to perform this due diligence and instructed the firms on how to conduct the due diligence review.[11]  Because Citigroup controlled the conduct of its due diligence, the loan review procedures did not materially vary based on which due diligence firm conducted a particular review.

55.     The Financial Crisis Inquiry Commission ("FCIC") described how third-party due diligence firms conducted due diligence reviews:

> The review fell into three general areas: credit, compliance, and valuation.    Did  the  loans  meet  the  underwriting  guidelines (generally the originator's standards, sometimes with overlays or additional  guidelines  provided  by  the  financial  institutions purchasing the loans)? Did the loans comply with federal and state laws,  notably  predatory-lending  laws  and  truth-in-lending requirements? Were the reported property values accurate?  And, critically: to the degree that a loan was deficient, did it have any "compensating  factors"  that  offset  these  deficiencies?    For example, if a loan had a higher loan-to-value ratio than guidelines called for, did another characteristic such as the borrower's higher income mitigate that weakness?  The due diligence firm would then grade the loan sample and forward the data to its client. Report in hand, the securitizer would negotiate a price for the pool

---

[10] Testimony of Richard M. Bowen, III to the Financial Crisis Inquiry Commission, at 9 (Apr. 7, 2010) ("Bowen Testimony").

[11] Bowen Testimony, at 9-12.

and could "kick out" loans that did not meet the stated guidelines.[12]

56.     Consistent with its corporate policy, Citigroup retained one or more due diligence firms, including 406 Partners, to perform due diligence on the Mortgage Loans prior to the Closing Date. ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

57.     In total, 406 Partners reviewed at least ██ of the loans considered for inclusion in the Trust.  Of those, 406 Partners reported to Citigroup that ██ loans, or ██ percent of the loans reviewed, failed to conform to underwriting guidelines or suffered from other material defects that would breach Citigroup's representations and warranties.  Citigroup ultimately securitized at least ██ defective loans that it knew to be defective—over ██ percent of the defective loans identified by 406 Partners.[13]  No fewer than ██████ of these defective loans were included in Group III or Group IV.

58.     Once it was presented by 406 Partners with facts indicating that these Group III and IV Mortgage Loans suffered from material defects, Citigroup knew that these Loans would breach its representations and warranties and should not have sold them to the Trust.

---

[12]  Financial Crisis Inquiry Commission, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States, January 2011 ("FCIC Report") at 166.

[13] These Mortgage Loans are listed in Exhibit 4.

Nevertheless, Citigroup chose to securitize these Loans.  Having made the unilateral decision to include the defective Mortgage Loans in the Trust, Citigroup was obligated to provide notice of the breaches to the Trustee and repurchase the Loans.  It failed to do either.

59.     Upon information and belief, Citigroup's use of sampling was designed to give Citigroup an understanding of the quality of the Loans included in the Trust, not merely the particular loans included in the samples.  Thus, Citigroup was on inquiry notice that the defect rate 406 Partners reported to it applied to all of the Mortgage Loans.  Notwithstanding its discovery of such facts, Citigroup failed to repurchase any Group III or IV Mortgage Loans and failed to notify the Trustee of any breaches of representations and warranties with respect to the Group III and IV Mortgage Loans, as the MLPA required.

60.     The reports that Citigroup received from 406 Partners regarding the Mortgage Loans were wholly consistent with the information Citigroup received from other sources.  Clayton Holdings, Inc. was another of Citigroup's due diligence firms.  According to Clayton's testimony to the FCIC and documents produced in connection with its testimony, 42% of the mortgage loans it reviewed for Citigroup between January 2006 and June 2007—the period during which the Mortgage Loans were originated, purchased and securitized in the Trust— failed to meet guidelines, possessed no compensating factors and thus should have been rejected.[14]  ***Yet Citigroup securitized nearly one third of these loans anyway.***  According to Clayton, Citigroup "waived in" 31 percent of the mortgage loans that Clayton determined failed to comply with underwriting guidelines, failed to comply with applicable law and/or related to mortgage properties with inaccurately reported valuations.[15]  Clayton informed the FCIC that

---

[14] *Id.* at 166-67.

[15] FCIC Report at 167, Figure 9.1.

these average rates were higher in the first six months of 2007, when Citigroup purchased and conducted due diligence on the bulk of the Mortgage Loans in the Trust, than they were in 2006.[16] Thus, given that each of Citigroup's samples were designed to be representative of the entire sampled pool, *Citigroup knew at the time that it was highly likely that more than one out of every eight loans it securitized between January 2006 and June 2007 did not comply with the applicable underwriting guidelines.*

61.     The defect rates reported to Citigroup by Clayton are ███████████ to the rates reported to Citigroup by 406 Partners.

62.     The Justice Department's investigation corroborates Clayton's testimony and the results of the due diligence on the Mortgage Loans.  On July 14, 2014, the Justice Department issued a Statement of Facts that summarized the findings of its investigation of Citigroup's securitization practices from 2005 through 2007.

63.     According to the Justice Department, Citigroup instructed its due diligence vendors to grade a loan "EV1" when the loan was originated according to the applicable underwriting guidelines and in compliance with applicable laws.  The vendor was to grade a loan "EV2" when the loan did not comply with applicable underwriting guidelines, but nonetheless had sufficient compensating factors to justify an extension of credit.[17]  Finally, the vendor was to grade a loan "EV3" when (a) the loan did not comply with applicable laws and regulations (b) the loan violated the applicable underwriting guidelines and lacked sufficient offsetting compensating factors; (c) the loan file was missing a key piece of documentation; (d) the

---

[16] All Clayton Trending Reports 1st Quarter 2006 – 2nd Quarter 2007, at 1, *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.

[17] Statement of Facts at 3.

borrower's stated income was unreasonable; (e) the borrower's credit score was below guidelines; or (f) the LTV ratio or DTI ratio exceeded the guidelines limits.[18]

64.     The Justice Department determined that during 2006-2007 (the timeframe in which the Mortgage Loans for the Trust were originated, purchased and securitized), Citigroup's due diligence firms graded "significant percentages" of the sampled loans as EV3 and that, nonetheless, Citigroup's "internal due diligence personnel reevaluated [the] loan grades and subsequently directed the due diligence vendor to assign grades of EV1 or EV2" to those loans.[19] In addition, "[i]n certain instances, Citigroup securitized loans that its vendors had reported exceeded Citigroup's valuation tolerances or where the vendor's valuation determination exceeded the reported or appraised value."[20]  In other words, Citigroup's vendors told Citigroup that in many instances the appraisal establishing the value of the loans Citigroup securitized was inaccurate and inflated (and thus the LTV ratio used to approve the loan was inaccurate).  The Justice Department specifically identified the Trust at issue in this action as one of the securitizations that it reviewed and "determined to contain significant percentages of defective loans."[21]  Thus, there is no question that the Justice Department's conclusions apply to the Mortgage Loans, including the Group III and Group IV Mortgage Loans.

65.     When Citigroup (through its ultimate parent Citigroup, Inc.) agreed to a $7 billion settlement with the Justice Department, to resolve the government's claims, Citigroup

---

[18] *Id.* at 3-4.

[19] *Id.* at 5.

[20] *Id.* at 9.

[21] Settlement Agreement between Citigroup, Inc., and the Department of Justice, at 5 n.1 (July 14, 2014), *available at* http://www.justice.gov/iso/opa/resources/558201471413645397758.pdf ("Statement of Facts"). (*citing* Appendix 1), Citigroup, Inc., RMBS Proposed Settlement, List of RMBS Trusts 7, *available at* http://www.justice.gov/iso/opa/resources/93201471413713173954.pdf).

acknowledged the facts contained in the Justice Department's Statement of Facts.[22]   That is, Citigroup acknowledged that its due diligence vendors informed Citigroup prior to the Closing Date that a significant number of the mortgage loans suffered from underwriting, compliance or other defects, which defects would breach its representations and warranties.

      B.      <u>Citigroup Continued Discovering Breaches After the Closing Date.</u>

      66.      Separate and apart from Citigroup's discovery of representation and warranty breaches on or about the Closing Date, Citigroup discovered such breaches when the Justice Department informed Citigroup that it had reviewed the Mortgage Loans and determined that this Trust "contain[ed] significant percentages of defective loans."[23]   On information and belief, Citigroup would have learned of the Justice Department's conclusions well before the Justice Department publicly disclosed its Statement of Facts.   Thus, in addition to Citigroup's pre-closing due diligence that identified defective loans, Citigroup discovered breaches after the Closing Date and was required to cure those breaches or repurchase the defective Mortgage Loans, including defective Group III and Group IV Mortgage Loans, but failed to do so.

      67.      Thus, both before and after selling the Mortgage Loans, through its own due diligence, the Breach Notices, and the Justice Department's investigation, Citigroup discovered loan defects and breaches of its representations and warranties, including with respect to the Group III and IV Mortgage Loans.   Yet despite this accumulated knowledge, Citigroup never notified the Trustee or repurchased any of the Group III or Group IV Mortgage Loans.

---

[22] *See* Settlement Agreement at 2.

[23] Settlement Agreement between Citigroup, Inc., and the Department of Justice, at 5 n.1 (July 14, 2014), *available at* http://www.justice.gov/iso/opa/resources/55820147141364539775 8.pdf ("Statement of Facts"). (*citing* Appendix 1), Citigroup, Inc., RMBS Proposed Settlement, List of RMBS Trusts 7, *available at* http://www.justice.gov/iso/opa/resources/93201471413713173954.pdf).

## V.   CITIMORTGAGE DISCOVERED REPRESENTATION AND WARRANTY BREACHES BUT FAILED TO NOTIFY THE TRUSTEE.

68.     CitiMortgage is the Master Servicer of the Trust and, pursuant to Section 2.03 of the PSA, has an obligation to provide notice to the Trustee when it discovers breaches of Citigroup's representations and warranties.   CitiMortgage is also the sub-servicer of the Mortgage Loans that CitiMortgage itself originated and of those originated by certain other originators.  As the Master Servicer and a sub-servicer, CitiMortgage is responsible for ensuring the timely collection of payments on the Mortgage Loans and, if a borrower stops making payments, for taking appropriate steps to mitigate the Trust's loss.  Indeed, § 3.01 of the PSA requires CitiMortgage to "seek to maximize the timely and complete recovery of principal and interest on the Mortgage Notes" consistent with the terms of the PSA and the best interests of Certificateholders.

69.     CitiMortgage's responsibilities required it to have regular contact with borrowers on the Mortgage Loans it serviced and to collect and maintain information concerning the borrowers' past and present financial condition.   Through these interactions, CitiMortgage discovered breaches of representations and warranties that materially adversely affected the value of the related Mortgage Loans, and the interests of the Certificateholders therein, particularly when servicing delinquent or defaulted Loans, including but not limited to (1) when it modified (or considered modifying) a Mortgage Loan, (2) when it received information related to a borrower's bankruptcy, (3) when it foreclosed on the property securing a Mortgage Loan, and (4) when it received notice that a mortgage insurer was rescinding its insurance policy on a Loan.

70.     First, CitiMortgage modified no fewer than 228 Mortgage Loans, including 79 of the Group III and IV Mortgage Loans, between 2008 and 2014.  Loan modification is a process

in which the servicer and the borrower agree to modify the terms of a delinquent or defaulted mortgage loan with the expectation that the borrower will be able to repay the loan pursuant to the modified terms.   A loan modification must be in accordance with the servicing and modification standards contained in the PSA, which include requirements that servicing must give due consideration to customary and usual standards of prudent mortgage lenders and that modifications must not be materially adverse to the interests of Certificateholders. PSA § 3.07. As such, the modification must improve the Trust's chances of receiving payment on a defaulted Mortgage Loan.  If a borrower has the ability to repay the Loan without modifying its terms, and can reasonably be expected to do so, a modification would be inappropriate.  If a borrower has the ability to pay some, but not all, of the amounts due (or would be able to do so over a different period of time), and those payments could reasonably be expected to exceed what CitiMortgage could obtain through foreclosure, the modification would likely be appropriate.   To assess whether this will be the case, CitiMortgage has to obtain information concerning the borrower's past and present financial condition (including income, assets and other debts), in addition to reviewing the information contained in the loan file, which is already in CitiMortgage's possession, custody or control.  CitiMortgage discovered representation and warranty breaches in no fewer than 55 Group III and IV Mortgage Loans and, therefore, CitiMortgage's own files for these Mortgage Loans substantiate the breaches.

71.     For example:

- 



72.     Second, the borrowers for no fewer than 41 CitiMortgage-serviced Group III and Group IV Mortgage Loans declared bankruptcy between 2008 and 2012.  When a borrower declares bankruptcy, he is required to file in the bankruptcy court information concerning, among other things, his past and present financial condition, his assets and liabilities and his employment.  Because the Trust, as the owner of the Mortgage Loan, becomes a creditor in the bankruptcy proceeding, the servicer will generally appear in the pending action to protect the Trust's financial interests, and review the filings made by the debtor.  Through these bankruptcy filings, CitiMortgage discovered breaches of representations and warranties that existed at the time of origination.

73.    For example, the borrower for Loan xxxx9401 stated on his loan application that he was employed as a carpentry foreman, earning $195,840 in 2006. The borrower filed for bankruptcy in 2009 and disclosed that in 2006 his gross income was in fact only $39,926 per year. CitiMortgage appeared in this bankruptcy case on behalf of the Trust and was aware of the borrower's admission and thus the misrepresentation of his income on the loan application.

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████    Thus, CitiMortgage not only knew that the borrower had misrepresented his income, it also knew that the misrepresentation vastly and unreasonably overstated his income by nearly 400%.

74.    Third, CitiMortgage has foreclosed on numerous properties securing defaulted Mortgage Loans. Prior to foreclosing on a mortgaged property, servicers engage in loss mitigation efforts with the borrower, including assessing whether a modification would be appropriate. As the loan servicing files themselves demonstrate, through these loss mitigation efforts and the foreclosure process itself, CitiMortgage discovered facts concerning the borrowers and the subject properties that constitute breaches of representations and warranties.

75.    For example:

- Loan xxxx9347: The borrower stated on the loan application that he was an owner of a property holding company earning $16,666 per month and net rental income of $3,886 per month. The post-closing tax return for 2009, obtained by CitiMortgage during the foreclosure process, indicated that the borrower's company had actually lost $40,000, or an average of $3,459 per month, for 2007, the year of the subject loan closing instead of earning $246,624 as reported with the loan application. A recalculation of DTI based on the borrower's revised income of $2,874 yields a DTI of 264.81% which far exceeds the guideline maximum of 50%.

76.    Fourth, CitiMortgage was specifically informed of breaches of representations and warranties by primary mortgage insurers in rescission notices received between 2008 and 2012. Upon information and belief, prior to paying out on a policy, a primary mortgage insurer

34

reviews the Loan for any fraud, underwriting guideline violation or other defect that would justify rescinding the policy. If the primary mortgage insurer finds a reason to rescind the policy, it will do so and provide an explanation of the basis for the rescission. The basis of the rescission and/or the rescission itself almost invariably also constitutes a breach of Citigroup's representations and warranties requiring repurchase of the affected Mortgage Loan. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

77.     In sum, as a sub-servicer and the Master Servicer, CitiMortgage was and continues to be well-equipped to detect breaches of representations and warranties. CitiMortgage did, in fact, discover breaches in the Mortgage Loans, including the Group III and Group IV Mortgage Loans. As they are the same entity, knowledge of breaches that CitiMortgage discovered in its role as a sub-servicer of the Mortgage Loans is knowledge that CitiMortgage possessed as Master Servicer. As such, upon becoming aware of such breaches, CitiMortgage was and is obligated under Sections 2.02 and 2.03(a) of the PSA to provide prompt notice to the Trustee and the other parties to the PSA of such breaches.

78.     Thus, CitiMortgage discovered breaches of representations and warranties that materially adversely affected the value of the related Group III and IV Mortgage Loans or the interests of the Certificateholders therein.   Yet, despite its discovery of such breaches CitiMortgage never notified the Trustee when it discovered breaches except in a handful of instances concerning mortgage insurance rescission.  CitiMortgage's handful of notifications to the Trustee demonstrates that it knew that it had a contractual obligation to notify under the PSA.

79.     Furthermore, pursuant to Section 8.05(b) of the PSA, CitiMortgage is obligated to indemnify the Trustee and hold it harmless against any loss, liability or expense resulting from a breach of its obligations and duties as Master Servicer under the PSA.  CitiMortgage, as Master Servicer, is required to pay such indemnification to the Trustee from its own funds, without reimbursement from the Trust.

## VI.   CITIMORTGAGE FAILED TO ENFORCE THE REPRESENTATIONS AND WARRANTIES MADE BY CITIGROUP.

80.     As Master Servicer, CitiMortgage is not only contractually required to promptly notify the Trustee of the breaches of representations and warranties it discovers, but also to independently enforce Citigroup's obligations under the MLPA to cure or repurchase defective Mortgage Loans.  Specifically, Section 3.02(c) of the PSA states:

> As part of its servicing activities hereunder, [CitiMortgage]. . . for the benefit of the Trustee and the Certificateholders, shall enforce the obligations of  . . . [Citigroup] under the Mortgage Loan Purchase Agreement, including, without limitation, any obligation . . . to purchase a Mortgage Loan  . . . on account of a breach of a representation, warranty or covenant, as described in Section 2.03(a). Such enforcement, including, without limitation, the legal prosecution of claims,  . . . and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as [CitiMortgage], in its good faith business judgment, would require were it the owner of the related Mortgage Loans. [CitiMortgage] shall pay the costs of such enforcement at its own expense, and shall be reimbursed therefor only (i) from a general recovery resulting from such enforcement, to the extent, if

36

> any, that such recovery exceeds all amounts due in respect of the related Mortgage Loans, or (ii) from a specific recovery of costs, expenses or attorneys' fees against the party against whom such enforcement is directed.

PSA §3.02(c).

81.     As described above, through its servicing and master servicing activities, CitiMortgage knew or should have known of breaches of representations and warranties in the Mortgage Loans it was servicing, particularly with respect to Loans it modified, for which the related borrower filed for bankruptcy, in which CitiMortgage, as Master Servicer, acting on behalf of the Trust, acquired the property underlying the Loan through foreclosure or deed-in-lieu of foreclosure, or as to which the mortgage insurer sent a rescission notice.  However, CitiMortgage did not notify the Trustee with respect to the vast majority of defective Mortgage Loans it discovered.

82.     Further, CitiMortgage did not enforce the repurchase obligations of its affiliate, Citigroup.  Indeed, Citigroup has not cured or repurchased a single defective Mortgage Loan.  In addition, CitiMortgage's failures were negligent, reckless and/or, including to the extent based upon or arising out of its affiliation with Citigroup, in bad faith, and constitute a separate and independent breach of CitiMortgage's duties under the PSA.

## VII.     CITIGROUP'S BREACH OF ITS CURE OR REPURCHASE OBLIGATION.

83.     In June, August, and December 2013, certain Certificateholders provided the Trustee with three notices of breaches of representations and warranties with respect to a total of 491 Mortgage Loans.  On July 1, 2013, the Trustee promptly sent notice of breaches with respect to Group III and Group IV Mortgage Loans to Citigroup (the "First Breach Notice").[24]  On

---

[24] The First Breach Notice is attached as Exhibit 5, with the accompanying schedule omitted given the personal information of borrowers potentially included in the breach descriptions.

August 20, 2013, the Trustee sent a second notice of breaches with respect to additional Mortgage Loans from Group IV (the "Second Breach Notice").[25]  On January 28, 2014, the Trustee sent a third notice of breaches with respect to additional Mortgage Loans from Groups III and IV (the "Third Breach Notice").[26]  The Breach Notices attached voluminous reports detailing breaches found with regard to each of the 491 defective Group III and IV Mortgage Loans, including both (i) the specific representations and warranties breached for each Mortgage Loan and (ii) a detailed narrative description of the facts establishing each breach.  Each Breach Notice requested that Citigroup cure the identified breaches or repurchase the defective Mortgage Loans.

84.     Citigroup responded to the Trustee's First Breach Notice on July 17, 2013, and to the Second Breach Notice on September 3, 2013.  Both responses set forth the blanket assertion that Citigroup could not repurchase a single loan because the Breach Notice did not provide "sufficient detail concerning the alleged breaches of representations and warranties to permit [Citigroup] to evaluate [the Trustee's] demands," notwithstanding the thousands of pages of details provided to it.[27]  Both responses requested reams of additional information that the Trustee was not required to provide and that, without exception, was either wholly irrelevant to Citigroup's cure or repurchase obligation (e.g., "the identity(ies) of any vendor(s) performing the Review, and the identity(ies) of the employees of such vendor(s) who performed the Review;"),

---

[25]  The Second Breach Notice is attached as Exhibit 6, with the accompanying schedule omitted given the personal information of borrowers potentially included in the breach descriptions.  The Second Breach Notice provided notice with respect to 114 Loans, but inadvertently stated it included 131 Loans.

[26]  The Third Breach Notice is attached as Exhibit 7, with the accompanying schedule omitted given the personal information of borrowers potentially included in the breach descriptions.

[27]  Citigroup's July 17, 2013 response to the First Breach Letter and its September 3, 2013 response to the Second Breach Letter are attached as Exhibits 8 and 9, respectively.

or that Citigroup, as Seller and Sponsor, should have had in its possession already, including the Loan Files themselves.[28]    Alternately, Citigroup could have obtained Loan Files from its affiliate, CitiMortgage.  And, regardless of whether such information was either relevant or in Citigroup's possession, custody or control, Citigroup's response was inconsistent with the terms of the MLPA and PSA.  Neither agreement entitles Citigroup to demand or receive additional information in response to notice from the Trustee.  The MLPA and PSA state that Citigroup will cure such breaches or repurchase the Loans within 90 days of discovery.  Although not required to do so, the Trustee sent a response to Citigroup on September 30, 2013 offering to provide additional information if Citigroup would enter into a non-disclosure and indemnity agreement.  To date, Citigroup has not responded to this offer.  Citigroup never responded to the Third Breach Notice.  Given that the 90 day period to repurchase the Loans in all three Breach Notices has long since passed, Citigroup is in breach of its contractual obligations.

85.    Indeed, Citigroup's responses to the First and Second Breach Notices are consistent with its publicly declared intention not to comply with its repurchase obligations.  Specifically, in its Securities and Exchange Commission Form 10-K, Citigroup stated that upon receiving a repurchase demand Citigroup "typically requests that it be provided with the underlying detail supporting the claim; however, to date, Citi has received little or no response to these requests for information.  As a result, the vast majority of the repurchase claims received on [Citigroup's] private-label securitizations remain unresolved."  These boilerplate demands are made regardless of the level of detail provided by the Trustee.  Thus, it appears that Citigroup's strategy in responding to breach notices is to consistently make blanket, unreasonable demands that are unauthorized by (or inconsistent with) the contracts to which it agreed, thereby leaving

---

[28] As discussed above, Citigroup gained access to the Loan Files when it purchased the Mortgage Loans.

the repurchase claims "unresolved." Thus, Citigroup has made its performance contingent on the satisfaction of conditions that do not exist in the Trust's governing agreement, or in the agreements governing similar trusts, and which it has no right to impose.

86.     Citigroup's pattern and policy of refusing to cure or repurchase upon demand is further evidenced by the publicly available statistical data regarding repurchase demands made to Citigroup. The Depositor—Citigroup's affiliate—is required to file quarterly ABS-15G reports with the Securities & Exchange Commission disclosing, among other things, the number and dollar value of loans that were the subject of a repurchase demand and the number and dollar value of loans repurchased by the responsible party. As a recent ABS-15G reports shows, Citigroup was presented with repurchase demands for 2,128 defective mortgage loans with a total outstanding principal balance of $673,584,520 for that reporting period alone. Citigroup has repurchased, at most, just three of those loans.[29] Those three loans had a total outstanding principal balance of just $240,993.[30] In accordance with its apparent pattern of leaving claims "unresolved," Citigroup claims it has not officially "rejected" a single repurchase demand.[31] Regardless of Citigroup's semantics, the failure to cure or repurchase nearly all repurchase demands within the contractual timeframe nonetheless constitutes a de facto rejection of its obligations.

87.     Thus, Citigroup's public filings indicate that it does not intend to cure or repurchase breaching Mortgage Loans, by making its performance contingent upon the

---

[29] Citigroup has stated with respect to other securitizations that repurchases reported in its ABS-15G filings were made by the servicer, not Citigroup. Thus, it is possible that Citigroup has not, in fact, repurchased any loans.

[30] *See* Citigroup Mortgage Loan Trust Inc. Form ABS-15G filed Nov. 14, 2013, *available at* http://www.sec.gov/Archives/edgar/data/1257102/000089109213009383/0000891092-13-009383-index.htm.

[31] *Id.*

satisfaction of unauthorized conditions, and therefore any further attempts to demand repurchase will be futile. Citigroup's responses to the First and Second Breach Notices also wrongly suggest that Mortgage Loans that "have been liquidated" are "outside the scope of the relief requested"— in other words, that Citigroup is not obligated to repurchase loans that have been liquidated. Not only is this assertion contrary to the terms of the parties' agreements, it is flatly contradicted by Citigroup's practice under contracts with substantially similar terms. The ABS-15G reports explain that the dollar value of the loans submitted for repurchase is based on the outstanding principal balance of each loan as of "the end of the reporting period or the most recent balance available for assets that remain in the pool at that time *or the latest balance reported if the asset was liquidated or removed from the pool prior to the end of the reporting period.*"[32] The reports also state that the number of loans that Citigroup actually repurchased, or had actually agreed to repurchase, "*may include [loans] that were previously liquidated, and for which a make-whole payment was made in lieu of repurchase*."[33] Citigroup is the responsible party for eighteen of the twenty-eight trusts included in the Depositor's filings in which loans were actually repurchased or make-whole payments were made.[34]

88. The process Citigroup describes in its ABS-15G reports is consistent with industry practice. The term "repurchase" is a recognized industry term that is understood to refer to a mechanism to make whole a mortgage loan purchaser for a seller's breach of its

---

[32] *Id.* (emphasis added).

[33] *Id.* (emphasis added).

[34] This process is corroborated in Citigroup's recent 10-Q in which it states that RMBS "expose Citi to potential claims for alleged breaches of its representations and warranties. In the event of a breach of its representations and warranties, Citi could be required either to repurchase the mortgage loans with the identified defects (generally at unpaid principal balance plus accrued interest) or to indemnify ("make whole") the investors for their losses on these loans." Citigroup Inc. Form 10-Q filed Oct. 30, 2014, *available at* http://www.sec.gov/Archives/edgar/data/831001/000083100114000136/c-9302014x10q htm

representations and warranties with respect to securitized loans. The mechanism ensures that the sponsor is responsible for and retains the entirety of the risk of loss associated with any breaches of the representations and warranties. Satisfaction of the repurchase obligation through make-whole payments also ensures that disputes between the Trustee and Citigroup relating to representation and warranty breaches do not hinder loss mitigation efforts with respect to Loans in default. The servicer is contractually required to service the Mortgage Loans in the best interests of the Certificateholders, consistent with industry standards and in the same way that it would service loans in its own portfolio. When a borrower has ceased making mortgage payments, industry standards require the servicer to employ customary loss mitigation techniques, including diligent pursuit of repayment from the borrower, and, if necessary, prompt foreclosure. Parallel efforts to recover from the borrower should be allowed to proceed unimpeded by disputes regarding Citigroup's repurchase obligation.[35] Indeed, such loss mitigation efforts would reduce Citigroup's potential repurchase liability—for example, recoveries through the foreclosure process would reduce the unpaid principal balance included in the Purchase Price. To the contrary, adopting Citigroup's assertion would only incentivize Citigroup to continue its practice of refusing and/or delaying repurchase of breaching loans in the hope that those loans would eventually be liquidated, which Citigroup would use to argue (incorrectly) that the Trust has no remedy for Citigroup's breaches of its representations and warranties with respect to those loans.

89.     The MLPA required Citigroup to attempt to cure the identified breaches within ninety days of receiving notice from the Trustee and, if it could not cure the breaches, to

---

[35] Neither the PSA nor the MLPA contain any provision requiring loss mitigation efforts to cease so that repurchase can be pursued.

repurchase the affected Group III and Group IV Mortgage Loans. Citigroup's opportunity to cure the Mortgage Loans included in the Breach Notices has expired. Therefore, Citigroup is obligated to repurchase such loans or to satisfy the repurchase obligation through make-whole payments.

**FIRST CAUSE OF ACTION**
**(as to Citigroup)**

**Breach of Contract: Breach of Representations and Warranties, Repurchase Obligation**

90.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if they were set forth fully herein.

91.     The MLPA is a valid, enforceable agreement to which Citigroup is a party. The PSA is a valid and enforceable agreement related to the MLPA.

92.     Under the terms of the MLPA, and through the assignment in the PSA of the Depositor's rights under the MLPA, the Trustee is given the right to enforce the obligations of Citigroup to the Trust and Certificateholders.

93.     The Trustee has performed all of its obligations and prerequisites with regard to and in advance of filing this action described herein. In particular, the Trustee delivered three Breach Notices to Citigroup, on July 1, 2013, August 20, 2013, and January 28, 2014, identifying Loans in Groups III and IV that were in breach of representations and warranties. More than ninety days have passed since the Trust notified Citigroup of its breaches of representations and warranties.

94.     Section 2.03(a) of the PSA and Section 6 of the MLPA require Citigroup to repurchase any Mortgage Loan within 90 days of discovery or notice of a breach of its representations and warranties if that breach has not been cured by Citigroup and materially

adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders.

95.     Citigroup breached its obligations under the MLPA and PSA by failing to cure the identified breaches of representations and warranties or repurchase the defective Mortgage Loans.

96.     Citigroup's responses to the Breach Notices have unequivocally indicated that it will not repurchase Mortgage Loans in the Trust.  Citigroup has thus repudiated its contractual obligation to do so.

97.     Based on its behavior to date, it is reasonable to expect that Citigroup will continue to refuse to repurchase most or all of the defective Mortgage Loans that are identified in the future.

98.     The Trust has been damaged by Citigroup's breaches.  Citigroup's breaches materially and adversely affect the value of the Mortgage Loans and the interests of the Certificateholders.

99.     The Trust is therefore entitled to an order that Citigroup must specifically perform its obligations under the PSAs—specifically, that it must repurchase or otherwise make the Trust whole for all Group III and IV Mortgage Loans identified in the Breach Notices or in the future as being in breach of Citigroup's representation and warranties.

### SECOND CAUSE OF ACTION
#### (as to Citigroup)

#### Breach of Contract: Failure to Notify and Repurchase Upon Discovery

100.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if they were set forth fully herein.

101.    The MLPA is a valid, enforceable agreement to which Citigroup is a party.  The PSA is a valid and enforceable agreement related to the MLPA.

102.    Under the terms of the MLPA, and through the assignment in the PSA of the Depositor's rights under the MLPA, the Trustee is given the right to enforce the obligations of Citigroup for the benefit of the Trust and Certificateholders.

103.    The Trustee has performed all of its obligations and prerequisites with regard to and in advance of filing this action described herein.

104.    Section 6 of the MLPA requires Citigroup to notify the Trustee of a breach of any of its representations and warranties in Section 5 of the MLPA that materially and adversely affects the value of the Mortgage Loan or the interests of the Trustee or Certificateholders therein promptly upon its discovery of such breach.

105.    Section 6 further requires Citigroup to repurchase any Group III or Group IV Mortgage Loan if Citigroup cannot cure that breach within 90 days of its discovery.

106.    Based upon the due diligence Citigroup's service provider 406 Partners conducted on a sample of the Mortgage Loans, the report made by 406 Partners to Citigroup, and the disclosure of the Justice Department's findings to Citigroup, as well as through notices of pervasive breaches that it received on its securitizations (as disclosed on its ABS-15G reports), Citigroup discovered that certain of the Group III and Group IV Mortgage Loans  breached its representations and warranties.

107.    Citigroup breached its obligations under the MLPA by (a) failing to provide notice to the Trustee of breaches discovered with respect to Group III and Group IV Mortgage Loans; and (b) failing to cure the discovered breaches or repurchase the defective Mortgage Loans.

108.    Citigroup's breaches of the MLPA have fundamentally defeated the protection the cure/repurchase mechanism was intended to provide.

109.    Citigroup had actual knowledge of breaches of its representations and warranties regarding Mortgage Loans, including Group III and Group IV Mortgage Loans, on or about the May 31, 2007 closing of the CMLTI 2007-AR7 securitization.   In addition, subsequent to the Closing Date, it discovered additional representation and warranty breaches, including as a result of the Justice Department investigation.   Under the MLPA, no notice by the Trustee was required when Citigroup independently discovered breaches of representations and warranties, and the 90-day cure period for all such independently discovered breaches expired before the filing of this complaint.

110.    The Trust is entitled to an order of specific performance requiring Citigroup to repurchase the Group III and Group IV Mortgage Loans with respect to which Citigroup discovered breaches of representations and warranties, which materially and adversely affect the value of the Loans and/or the interests of the Trust and Certificateholders therein or equivalent damages.

## THIRD CAUSE OF ACTION
### (as to CitiMortgage)

### Breach of Contract: Failure to Notify and to Enforce Seller's Obligations

111.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if they were set forth fully herein.

112.    The PSA is a valid, enforceable agreement to which CitiMortgage is a party.

113.    The Trustee has performed all of its obligations and prerequisites with regard to and in advance of filing this action described herein.

114.    Under Section 3.04 of the PSA, CitiMortgage is obligated and primarily liable to the Trustee and the Certificateholders for its performance of its duties as Master Servicer.

115.    As Master Servicer, CitiMortgage is required under the PSA (including Sections 2.02 and 2.03(a) thereof) to notify the Trustee and other parties to the PSA promptly upon discovery of a breach by Citigroup of any of the representations and warranties under the MLPA that materially adversely affect the value of the Mortgage Loans or the interests of Certificateholders therein.

116.    Section 3.02(c) of the PSA requires CitiMortgage to enforce Citigroup's obligations under the MLPA, including Citigroup's obligation to cure or repurchase a Mortgage Loan for which Citigroup has breached a representation or warranty.

117.    On information and belief, in performing its duties as sub-servicer and Master Servicer of certain Mortgage Loans after closing, CitiMortgage discovered breaches of Citigroup's representations and warranties with regard to some or all of the Group III and Group IV Loans, including, without limitation, those Group III and Group IV Loans that CitiMortgage serviced that were modified, for which the borrower filed for bankruptcy, or became REO Property through foreclosure or deed-in-lieu of foreclosure.

118.    CitiMortgage breached its obligations under the PSA by (a) failing to provide notice to the Trustee of the breaches it discovered with respect to the Mortgage Loans it serviced; and (b) failing to enforce Citigroup's obligations under the MLPA to cure or repurchase the defective Group III and Group IV Mortgage Loans.  Such failures constitute negligence in the performance of its duties and/or, including to the extent based upon or arising out of its affiliation with Citigroup, bad faith, willful misfeasance and reckless disregard of its obligations and duties.

47

119.    Pursuant to Section 8.05 of the PSA, CitiMortgage is obligated to indemnify the Trustee and hold it harmless against any loss, liability or expense resulting from a breach of its obligations and duties as Master Servicer under the PSA.  CitiMortgage, as Master Servicer, is required to pay such indemnification to the Trustee from its own funds, without reimbursement from the Trust.  The Trust is entitled to damages for CitiMortgage's breaches of its obligations under the PSA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

(a)    On the first cause of action, for an order of specific performance that Citigroup be required to repurchase or otherwise make the Trust whole for all Group III and IV Mortgage Loans breaching Citigroup's representation and warranties, including without limitation those listed in the Breach Notices and those identified by the Trust either in this lawsuit or in the future, and an award of damages against Citigroup compensating the Trust for Citigroup's breaches of the PSA and MLPA, in an amount to be proven at trial;

(b)    On the second cause of action, for an order of specific performance that Citigroup be required to repurchase all Group III and Group IV Mortgage Loans with respect to which Citigroup discovered breaches of representations and warranties, and an award of damages for Citigroup's failure to comply with its obligation to notify the Trustee of such breaches, cure such breaches or repurchase the affected Mortgage Loans;

(c)    On the third cause of action, for an award of damages against CitiMortgage compensating the Trust for CitiMortgage's breaches of its obligations under the PSA, and for indemnification to the Trustee for losses and expenses incurred due to CitiMortgage's breaches of its obligations and duties under the PSA, in an amount to be proven at trial;

(d)      All costs of the Trusts associated with this action (including the Trustee's attorneys' fees), in an amount to be proven at trial;

(e)      Prejudgment interest as approved by the Court; and

(f)      For all such other relief to which the Plaintiff is entitled under law or in equity.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable as a matter of right.

Dated: January 12, 2015
      New York, NY

MCKOOL SMITH, P.C.

By: _____
      Gayle R. Klein
      Robert W. Scheef
      Courtney B. Statfeld

One Bryant Park, 47th Floor
New York, NY 10036
gklein@mckoolsmith.com
rscheef@mckoolsmith.com
cstatfeld@mckoolsmith.com
(t) (212) 402-9400
(f) (212) 402-9444

*Attorneys for Plaintiff*